**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.** <u>21-8034-WM</u>

IN RE APPLICATION FOR
CRIMINAL COMPLAINT

_____/

**CRIMINAL COVER SHEET**

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?      ___ Yes  ✓ No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?   ___ Yes  ✓ No

3. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?      ✓ Yes  ___ No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

BY:     _____

ASSISTANT UNITED STATES ATTORNEY
District Court No. A5501696
500 South Australian Avenue, Suite 400
West Palm Beach, Florida 33401
Tel:        561-820-8711
Fax:       561-805-9846
Email:    Marton.Gyires@usdoj.gov

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Alireza Hendijani, Diego Navarro, Jose Esquer, Tyler Roman, Emilio Santiago, Joshua Grauer, Andrew Ruelas, and Manuel Topete | ) ) ) ) ) ) | Case No. 21-8034-WM |
| *Defendant(s)* | ) | |

**FILED BY_____KJZ_____D.C.**

**Feb 2, 2021**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___February 2019 through present___ in the county of ___Palm Beach___ in the ___Southern___ District of ___Florida___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 846 | Conspiracy to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1) |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

_Complainant's signature_

Gregory Hoffman, FBI Special Agent
_Printed name and title_

~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~ Sworn and Attested to me by Applicant by Telephone (FaceTime) per Fed.R.Crim.P. 4(d) and 4.1.

Date: ___February 2, 2021___

_Judge's signature_

City and state: ___West Palm Beach, Florida___

William Matthewman, U.S. Magistrate Judge
_Printed name and title_

## AFFIDAVIT

I, Gregory Hoffman, depose and state as follows:

## Introduction

1.     I am a Special Agent of the FBI assigned to the Miami Field Office, West Palm Beach Resident Agency, and have been since March 2016.  As such, I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7)—that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516(1).  As a Special Agent of the FBI, I have been assigned to the West Palm Beach Resident Agency, Violent Crime Squad since August 2016.  My duties have included the investigation of a number of violent criminal offenses and the trafficking of narcotics.  Additionally, I have received training on the subject of narcotics trafficking and money laundering from the FBI and have been personally involved in investigations concerning the possession, manufacture, distribution, transportation, and importation of controlled substances, as well as methods used to finance drug transactions and launder drug proceeds. Through investigations and training, I have become familiar with narcotic traffickers' methods of operation including the distribution, storage, and transportation of narcotics, the collection of money that represents the proceeds of narcotics trafficking, and money laundering.

2.     This affidavit is based upon my own knowledge, information provided to me by other law enforcement officers, and other sources of evidence.  This affidavit is submitted for the limited purpose of establishing probable cause for the issuance of a criminal complaint against Alireza Hendijani ("HENDIJANI"), Diego Navarro ("NAVARRO"), Jose Esquer ("ESQUER"), Tyler Roman ("ROMAN"), Emilio Santiago ("SANTIAGO"), Joshua Grauer ("GRAUER"), Andrew Ruelas ("RUELAS"), and Manuel Topete ("TOPETE"), for violation of the laws of the United States, that is, conspiracy to distribute controlled substances (heroin and fentanyl), in violation of Title 21, United

1

States Code, Section 846.[1]  As such, this affidavit does not contain all of the information known to me regarding this investigation.

## PROBABLE CAUSE

*Origin of investigation and controlled purchases of heroin from ROMAN*

3.      In or about the month October 2019, law enforcement received information from a DEA confidential source ("CS-1") about a narcotics dealer selling large amounts of heroin within Palm Beach County who the CS said had the nickname "ROM." "ROM" would later be identified by law enforcement as Tyler Edward ROMAN.[2]

4.      On or about October 23, 2019, a DEA undercover agent ("UC"), accompanied by a different CS (CS-2), purchased approximately one ounce of heroin from ROMAN (then unidentified) for $2,000.00.  The suspected heroin field-tested positive for the presence of heroin. Additional controlled acquisitions of heroin from ROMAN took places as follows:  a November 15, 2019 acquisition of a free sample of approximately one gram by the UC and CS-1; a November 21, 2019 purchase of approximately one ounce by the UC and CS-1; a December 4, 2019 purchase of approximately one ounce by the UC and CS-1; a December 18, 2019 purchase of approximately one ounce by the UC; and a January 8, 2020 purchase of approximately one ounce by the UC.

*December 5, 2019: ROMAN receives a package suspected to have contained narcotics*

5.      On December 5, 2019, agents conducted a surveillance operation wherein ROMAN was observed picking up a United States Postal Service (USPS) parcel suspected to contain drugs from a residential address in Boca Raton, Florida.  At approximately 11:00 a.m., GPS location data received from ROMAN's telephone and vehicle trackers (previously obtained by court order) reported his location to be in downtown West Palm Beach, Florida.  ROMAN proceeded to drive south on I-95

---

[1] This affidavit is not intended to limit the drug quantities and types attributable to the defendants at trial, sentencing, or any other phase of the case, but is merely intended to provide probable cause for the issuance of a criminal complaint.
[2] ROMAN is currently on federal supervised release, having been previously sentenced in the Southern District of Florida on November 13, 2014 to 70 months' imprisonment to be followed by five years of supervised release based

according to GPS location data and at approximately 11:30 a.m., ROMAN exited I-95 at West Palmetto Park Road in Boca Raton, Florida. Surveillance saw ROMAN driving around, including driving by 1298 Southwest 13th Street, Boca Raton (hereinafter referred to as "package residence"). At approximately 1:04 p.m., aircraft surveillance personnel observed a USPS worker deliver a large box to the package residence, leaving that box on the front porch. USPIS later confirmed that this package was sent from San Diego, California; the shipping label listed the sender's name as "John" and the recipient as "LYN." In my training and experience, I know that when contraband is sent via mail, the shipping labels often times contain false names. Below is an image of the shipping label:



6.      Shortly thereafter, the aircraft surveillance personnel observed a white female, later identified as a person with the initials "S.M.," step out of the package residence through the front door and inspect the exterior of the large box before leaving it on the front steps and re-entering the residence. At approximately 1:13 p.m., the same PBSO aircraft observed ROMAN arrive at the package residence, park in the driveway, exit his vehicle and walk towards the front door of the package residence. The PBSO aircraft then observed ROMAN pick up the box, return to his vehicle and place the box in his vehicle through the driver's side door. ROMAN eventually departed the area.

7.      A later review of security camera footage at the Escondido, California, U.S. Post Office from which the package was sent determined that on December 4, 2019, a man, later identified as Jose ESQUER ("ESQUER") entered the facility and mailed the parcel received at package residence on

---

upon a conviction for conspiracy to possess with intent to distribute cocaine in case number 14-cr-60165-WPD.

December 5, 2019. Jose ESQUER's involvement in sending other packages suspected to contain drugs is described further below.

*Western Union business records reveal transactions between ROMAN and ESQUER and NAVARRO*

8.       Western Union records relating to ROMAN's name, address, and date of birth, showed, among other things, that ROMAN had sent money to Jose ESQUER and Diego NAVARRO in Escondido, California (a city located about 30 miles northeast of downtown San Diego).

*Evidence gathered via Facebook against Diego NAVARRO & Jose ESQUER*

9.       A review of NAVARRO's Facebook profile showed it had multiple public postings featuring multiple firearms, large amounts of US currency, luxury items, and at least one photo featuring a white powdery substance consistent in appearance with cocaine alongside a rolled up bill of U.S. currency. The profile also makes a ridiculing reference to the DEA in a photograph posted with the text "El que no savi don ta. Haha la DEA wishs they could have my clave la calsidea mi la plea." Your affiant is aware that this text features informal internet slang combined in both English and Spanish. Your affiant, relying upon the translation of a FBI agent fluent in both English and Spanish languages understands this text to loosely convey the following: "They don't know where they are. The DEA wishes they could have my key. DEA jerks me off."   I interpret this statement as a taunt posted on the NAVARRO profile aimed at the DEA, regarding yet unknown drug activity.  Furthermore, the profile features posted photographs making reference to Sinaloa. Additionally, a profile in the name of "Jose ESQUER" was found as having been linked as "friends" with NAVARRO's profile.[3] This "Jose ESQUER" was featured in a photograph alongside NAVARRO on NAVARRO's Facebook page in a post in 2015 (ESQUER is on the left side):

---

[3] In my training and experience, I am aware that the act of "friending" among Facebook profiles involves one user sending a "friend request" to another user who then may accept, reject, or ignore the request. Profile are only linked as "friends" once one user sends a request and the other accepts it.



This photograph of ESQUER matches the physical characteristics of the individual known to have mailed the package picked up by ROMAN from S.M. at the package residence on December 5, 2019 as described in paragraph 7 above.

*ESQUER mails packages to Escondido, CA from West Palm Beach*

10.     On January 3, 2020, a male matching the physical description of ESQUER entered the downtown West Palm Beach U.S. Post Office located at 640 Clematis Street West Palm Beach, Florida. Security camera footage captured a male matching the physical description and appearance of ESQUER mailing four parcels to locations in California and paying in cash.

*Search warrant executed on package intercepted in Escondido, CA*

11.     On January 22, 2020, USPIS personnel identified a package at the Margaret L. Sellers Processing and Distribution Center in San Diego, California, as bearing a totality of indicators that, in their training and experience, indicated the package possibly contained narcotics (hereinafter "INDIANTOWN PACKAGE"). These indicators included the following:

a)      the size, shape, and appearance of the parcel were consistent with parcels previously identified that contained controlled substances or controlled substance proceeds;

b)      the parcel was a ReadyPost mailing carton, approximately 15" x 12" x 10", which was consistent with packages in previous investigations that have contained controlled substances or controlled substance proceeds;

c)      the parcel was mailed from a controlled substance source city, to wit, San Diego, California;

d)      the parcel contained a Priority Mail Express label filled out or completed in handwriting;

e)      the seams of the parcel were heavily taped; and

f)      the parcel postage was paid in cash in the amount of $81.35.

12.     This is a photograph of the address label:

5



13.     The package was detained for further investigation. This package was addressed to "15305 SW Adams ave Indiantown FL Kyle. S" with a sender of "Josh. P 625 W 8th Ave Escondido CA 92025." A review by USPIS personnel of postal and public commercial databases could not associate "Josh P" or "Kyle S" to either the recipient address or return address. On January 23, 2020, USPIS personnel subjected the package to a canine sniff test by a trained narcotics detection canine and handler. A warrant to open the package was applied for, signed in the Southern District of California, and executed on January 27, 2020. Upon opening the package, USPIS personnel discovered 1.4 kilograms of a substance recognized by them through their training and experience to be consistent in appearance and texture with methamphetamine. A TruNarc field narcotics test kit returned positive results for methamphetamine.

14.     Subsequently, video security camera footage from the U.S. Postal Service Office from when the package was mailed on January 22, 2020 was obtained. A review of this footage shows that an individual matching the physical characteristics of NAVARRO was the person who mailed the package.[4]  The return address on this package includes "625 W 8th Street Escondido, CA92025." Western Union records list a phone number for NAVARRO as 760-755-3381, and subscriber records for that phone number list the address as 634 West 8th Avenue, Escondido, CA 92025 (which is an address a few numbers different from the return address). Western Union records also list 634 West 8th Avenue, Escondido, CA 92025 as an address for NAVARRO.

---

[4] It should be noted that not only did the individual captured on the security camera footage match the physical characteristics of NAVARRO but the person was also wearing a large metallic watch with a large dark face similar in

*Subsequent analysis of labels on parcels received at the package residence show detailed commonalities with the INDIANTOWN PACKAGE that contained methamphetamine.*

15.    After the search warrant was executed in California on the INDIANTOWN PACKAGE, agents reviewed the labels of packages sent to the package residence where S.M. lives, including the package discussed above relating to December 5, 2019.  These labels are included below:

a.    The package received at the package residence on December 5, 2019; the shipping label is pictured here again:



b.    The INDIANTOWN package shipping label is pictured here again:



c.    A package sent from Arizona to the package residence on September 20, 2019; the shipping label is pictured here:

---

appearance to one worn by NAVARRO in many photographs on his Facebook profile, including the one included in this affidavit's section regarding NAVARRO's Facebook profile.



  d. A package sent from Escondido to the package residence on November 15, 2019; the shipping label is pictured here:



  e. A package sent from Escondido to the package residence on November 21, 2019; the shipping label is pictured here:



 16. In my training and experience, I recognize several characteristics shared between these parcels. All of the packages have handwritten Priority Mail Express labels. Many of the packages originated from San Diego County, California. All the packages use generic first names or no name

when identifying the sender and recipient parties.   Two packages sent to the package residence identified "Mike" as the recipient.   Both the package to the INDIANTOWN PACKAGE and the November 21, 2019 package identify "Josh. P" as the sender.   Furthermore, two packages exhibit a similarly unique use of a period between a first name and surname with the INDIANTOWN PACKAGE being sent to "Kyle. S" and the parcel sent to the package residence on November 21, 2019 being sent to "Ryan. L".   Those same two packages also both featured an atypical placement of the recipient name, which was offset to the bottom right-hand corner of the box provided for recipient information.   The totality of these circumstances lead me to conclude that these packages are originating from a common group of senders and that there is a fair probability that the packages all contained narcotics.

*Security camera footage showing ESQUER and NAVARRO mailing packages suspected to contain narcotics out of California*

17.   Investigation has determined that on multiple dates, individuals matching the physical descriptions of ESQUER and NAVARRO have mailed similarly sized parcels out of multiple San Diego County U.S. Post Office locations.   The following are some examples.   Security camera video from a Vista, California, U.S. Post Office shows Jose ESQUER mailing a package on December 4, 2019; a screen shot from the video appears here:



18.   Security camera video from a San Marcos, California, U.S. Post Office shows Jose ESQUER mailing a package on January 3, 2020; a screen shot from the video appears here:



19.     Security camera video from a Escondido, California, U.S. Post Office shows Diego NAVARRO mailing the INDIANTOWN PACKAGE containing methamphetamine on January 22, 2020; two screen shots from the video appear here:



20.     Security camera video from a Windsor Locks, Connecticut U.S. Post Office shows an individual matching the description of Diego NAVARRO mailing a package to North Palm Beach, Florida on February 5, 2020 (hereinafter "North Palm Package").  This package was sent to 1857 Pleasant Drive, North Palm Beach, Florida.  As explained below, ROMAN was later observed retreiving this package.  Travel records from United Airlines confirmed that on February 4, 2020 NAVARRO traveled from San Diego International Airport in San Diego, California to Bradley International Airport in Windsor Locks, Connecticut, as explained further below.  Two screenshots from the February 5, 2020 security camera footage appear here:

 

*ESQUER mails packages to Escondido, California from West Palm Beach*

21.    On January 10, 2020, a male matching the physical description of ESQUER entered the downtown West Palm Beach U.S. Post Office located at 640 Clematis Street West Palm Beach, Florida. Security camera footage captured a male matching the physical description and appearance of ESQUER mailing four parcels to locations in California and paying in cash (see photograph here).



22.    On February 5, 2020 security camera footage at the West Palm Beach U.S. Post Office located at 640 Clematis Street showed a man who matched the physical appearance of ESQUER mailing two packages.  A screenshot of the video appears here:

11



Agents in San Diego, California obtained federal warrants to open the packages. The packages were opened and found to each contain cash; one package contained $8,500 in U.S. currency and the other package contained $8,000. The contents were photographed and documented and inserted back into the packages. The packages were then mailed to their final intended destination at 230 North Citrus Avenue, Unit A, Vista, California 92084.

*Surveillance of ROMAN retrieving package in North Palm Beach, Florida on February 6, 2020*

  23. On February 6, 2020, at approximately 1:40 p.m., ROMAN was viewed in the area of 1857 Pleasant Drive, North Palm Beach, Florida, 33408. Investigation has revealed that this address has previously received multiple packages from individuals outside the state of Florida who are shipping narcotics in packages via the United States Postal Service mailing system. At approximately 1:42 p.m., a carrier for the United States Postal Service delivered a package to the aforementioned residence. The package had a return address of 42 Dibble Hollow Lane, Unit 42, Windsor Lock, Connecticut, 06096 with the sender being "Matt. T." This package was mailed on February 5, 2020 by a person matching the physical characteristics of NAVARRO, as explained above in paragraph 20. At approximately 1:42 p.m., ROMAN was observed parking in the driveway of the residence for approximately one minute and then leaving the area. Mobile surveillance was conducted and ROMAN was followed directly to his residence located at 1441 Brandywine Road, West Palm Beach, Florida, 33409. ROMAN was seen walking to his front passenger door, grabbing a book bag, and then walking into his residence. Approximately fifteen seconds later, ROMAN was seen exiting his residence without

the book bag and then drove away from the residence. Mobile surveillance continued with the assistance of the Palm Beach County Sheriff's Office (PBSO) Aviation.

24.     At approximately 2:40 p.m., after ROMAN was seen exiting and reentering his vehicle at several locations, including two smoke shops and his home, PBSO aviation advised that ROMAN parked near a dumpster behind the CVS located at 245 South Military Trail, West Palm Beach, Florida, 33415. Shortly thereafter, PBSO Aviation advised they witnessed ROMAN throw an object into a dumpster and immediately leave the area. As ROMAN left the area, DEA personnel retrieved an empty brown box from the same dumpster. This box had a mailing label bearing a tracking number that matched USPS records of the mailing label delivered to 1857 Pleasant Drive, North Palm Beach. A photograph of the box and mailing label appear below:



*Approximately one-half kilogram of fentanyl seized*

25.     On March 18, 2020, federal law enforcement, in conjunction with local law enforcement partners of the Palm Beach Sheriff's Office, engaged in surveillance of ROMAN. ROMAN was observed by federal law enforcement to go to UpperKutz barber shop located at 2173 Jog Road, Greenacres, Florida, at approximately 10:00am. At approximately, 11:00 a.m., ROMAN and a man identified as Juan Garcia were observed to depart the barbershop and go to a third party business. ROMAN was then observed leaving in his Chevrolet Silverado with Garcia following in another

vehicle.

26.      The two vehicles were observed entering the area of the Lake Osborne neighborhood of Lake Worth, FL.  Once arriving in the Lake Osborne neighborhood, ROMAN was observed parking his vehicle and entering Garcia's vehicle. Garcia's vehicle then proceeded to traverse the neighborhood to drive in a semi-random pattern.  Agents were not able to discern an apparent motive or reason behind this driving.  Agents were aware through prior investigation that 434 Virginia Drive Lake Worth, FL ("VIRGINIA DRIVE ADDRESS"), an address inside the Lake Osborne neighborhood, was associated with Garcia's family. At this time, agents contacted inspectors of the U.S. Postal Inspection Service to determine whether a package with characteristics suspicious of a drug package was bound for delivery to VIRGINIA DRIVE ADDRESS.   At that point, an inspector of the USPIS confirmed that an approximately six-pound parcel was inbound for the address.  The inspector was able to obtain a photograph of the parcel's mailing label which showed characteristics similar to prior parcels mailed by NAVARRO and ESQUER as described above.  A photograph of the label is featured below:



27.      The characteristics common to the parcel bound for VIRGINIA DRIVE ADDRESS and the prior parcels described above include:

     a.      The package was a Priority Mail Express parcel;
     b.      The label was handwritten;
     c.      The parcel was inbound from the San Diego County, CA area;
     d.      The package was heavily taped;
     e.      The label lacked a name in the "From" section and featured solely a singular

14

name in the "To" section.[5]

28.     Surveillance agents observed the delivery of the Subject Parcel at approximately 1:20 pm.  Following consultation with USPIS, agents seized the box from the front porch of the VIRGINIA DRIVE ADDRESS and brought it to the offices of the Drug Enforcement Administration at 444 West Railroad Avenue, West Palm Beach, Florida 33401.  At approximately 1:34 p.m., ROMAN and Garcia departed in their respective vehicles from where they were parked and were observed driving to the area of the VIRGINIA DRIVE ADDRESS.  Garcia was observed entering the driveway of the VIRGINIA DRIVE ADDRESS while ROMAN parked nearby.  Over the next twenty minutes, ROMAN and Garcia were observed inspecting the front porch of the VIRGINIA DRIVE ADDRESS as well as neighboring addresses in an apparent search for the parcel.

29.     A federal search warrant was obtained to open the parcel, which was executed on March 18, 2020.  Inside the box, agents found approximately one-half kilogram of a substance that field-tested positive for fentanyl.

30.     Security camera footage revealed that a person matching ESQUER's physical appearance mailed the parcel from San Diego County, California.  Below are screenshots of the surveillance video:

 

---

[5] The name used in the "To" section was "Johnson."

*NAVARRO, ESQUER, SANTIAGO, RUELAS, and TOPETE distribute approximately one kilogram of fentanyl from West Palm Beach*

31.    On or about March 26, 2020, law enforcement received a travel alert from American Airlines that ESQUER, NAVARRO, Manuel Alejandro TOPETE and Andrew Guadalupe RUELAS were traveling to West Palm Beach, Florida from San Diego, California.  At approximately 10:15 a.m., surveillance agents assisted by GPS location data from telephone number 760-670-1443, previously identified as being used by ESQUER, located the four subjects sitting on a bench at the Walmart located at 4375 Belvedere Road, West Palm Beach, Florida.  Surveillance agents visually confirmed the identities of two of the subjects as ESQUER and NAVARRO as they were previously known to law enforcement in the course of this investigation.  All four of the subjects were observed going into Walmart and going to the general area of the store containing packaging material.  Security camera footage showed ESQUER and NAVARRO purchasing packaging material.  At approximately, 10:37 a.m., the four subjects were observed walking over to Nana's Diner located at 1230 N. Military Trail, West Palm Beach, Florida. While they were outside Nanas Diner, ESQUER was observed handing stacks of money to the other three individuals.  All four individuals were observed individually handling and counting cash.  Photographs were taken by surveillance agents.

32.    At approximately, 11:18 a.m., the four individuals were observed going back to the northwest corner of the Walmart parking lot.  At approximately, 12:12 p.m., a silver Nissan Pathfinder arrived at the location and surveillance agents observed Emelio SANTIAGO[6], an individual previously known to law enforcement, exiting the driver side of the vehicle and meeting with the four subjects at

---

[6] On October 19, 2010, SANTIAGO pleaded guilty in federal court in the Southern District of Florida to two counts: felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1); and possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1), in case number 10-cr-80098-RAR.  In January 2011, SANTIAGO was sentenced to a total of 120 months' imprisonment and five years' supervised release.  On October 23, 2019, SANTIAGO was sentenced to time-served on a supervised release revocation for unlawfully possessing or using a controlled substance. SANTIAGO has numerous other criminal convictions involving drugs: 2001 conviction for sale of cocaine (2001-CF-0062);  2001 conviction for sale of cocaine (2001-CF-0171); 2001 conviction for sale of cocaine within 1000 feet of place of worship (2001-CF-6895); 2001 conviction for possession of cocaine (2001-CF-11869); 2002 conviction for sale of cocaine (2002-CF-013898); possession of cocaine and heroin (2006-CF-015135B); 2009 possession of marijuana under 20 grams (2009-MM-023756); and 2010 possession of marijuana under 20 grams (2010-

the rear of the vehicle.  SANTIAGO was observed opening the rear hatch of the vehicle, reaching inside, taking a tan color book bag from the spare tire compartment area of the vehicle, and handing it to ESQUER.  ESQUER was observed inspecting the inside of the book bag before taking possession of it.  At that point, SANTIAGO left the area.  Subsequently, all four remaining subjects walked to the north end of the parking lot toward a thin copse of trees bordering the northwest edge of the lot.

33.     In the vicinity of these trees, NAVARRO was observed putting on blue latex gloves and transferring the contents of the tan book bag into a manila envelope as ESQUER looked on.  RUELAS and TOPETE were observed keeping watch in an effort to counter surveil, while NAVARRO and ESQUER manipulated the packaging material and the contents of the book bag.  Shortly thereafter, the group departed the parking lot northbound along Military Trail with NAVARRO discarded items, including blue latex gloves as he walked.

34.     The subjects then again stopped and loitered in front of Nana's Diner for several minutes. At approximately, 12:37 p.m., the four subjects were observed getting into a black Land Rover which agents believe to have been a ride share service.  At approximately, 12:48 p.m., the four subjects were observed arriving at the Downtown West Palm Beach Post Office located at 640 Clematis Street, West Palm Beach, Florida 33401. At that time, ESQUER was observed entering the counter area of the Post Office and completing parcel mailing labels.  At approximately 12:54, he departed the counter area and was observed meeting the other individuals outside the Post Office.  At approximately 12:58 p.m., NAVARRO was observed entering the counter area of the Post Office with two parcels.  NAVARRO mailed the two packages which were retrieved by US Postal Inspectors.

35.     A federal search warrant was obtained and executed the same day as to the two mail parcels.  The two packages contained a total of approximately one kilogram of a substance that field-tested positive for fentanyl.

36.     Travel records, phone tracking data, and surveillance revealed that NAVARRO,

MM-003258).   SANTIAGO is still on federal supervised release.

ESQUER, RUELAS, and TOPETE had taken the same American Airlines flight that was scheduled to depart from San Diego, California at approximately 10:29 p.m. local time on March 25, 2020, which landed for a layover in Charlotte, North Carolina scheduled for approximately 5:57 a.m. local time.  The next leg of the trip had the four individuals flying from Charlotte to Palm Beach International Airport, and they landed the morning of March 26.  Records show that NAVARRO booked his own ticket from San Diego to West Palm Beach.   Records show that ESQUER booked the tickets for himself and RUELAS and TOPETE from San Diego to West Palm Beach.

37.     After leaving the aforementioned post office in West Palm Beach, the four individuals rode in the same car to a store parking lot in or near Fort Lauderdale, Florida.  They remained in the parking lot for approximately one hour, before departing in another vehicle to Fort Lauderdale International Airport.   The four individuals then boarded the same plane headed for Charlotte, North Carolina, which was a layover, with the final destination of San Diego, California.  For the trip back to San Diego from West Palm Beach, records show that ESQUER booked all four tickets.

*May 7, 2020 seizure of packages containing fentanyl*

38.     On or about May 7, 2020, a Postal Inspector in California was conducting postal database checks and identified two parcels, as bearing characteristics common to other drugs parcels previously seized from the San Diego County Area, and referred the parcels to the Miami Division Postal Inspectors. One of the subject parcels was addressed to 117 Wisconsin St, Lake Worth, FL 33461 and the other to 516 N "B", Lake Worth, FL 33460.  Location monitoring data from a federal tracking warrant that was active at the time on a cellular phone being used by Emilio SANTIAGO, showed that SANTIAGO's phone was in the vicinity of 117 Wisconsin Street, Lake Worth, Florida between approximately 10:47 a.m. and 6:45 p.m. on May 7, 2020.[7]  Location monitoring data from the same phone showed that it was in the vicinity of 516 North "B" Street, Lake Worth, Florida at approximately 10:16 a.m. on May 7, 2020.  A

---

[7] Records show that a resident at 117 Wisconsin Street at the time was the sister of Janairy Sanchez.  Janairy Sanchez is SANTIAGO's wife or girlfriend and has lived with SANTIAGO at more than one residence, including SANTIAGO's

federal search warrant was obtained to open the parcels, which were found to contain a total of approximately one kilogram of a substance that field-tested positive for fentanyl.  The parcels were mailed from two separate post offices in San Diego County, California.  Surveillance video from the post offices in San Diego County showed that the person who mailed both packages has physical characteristics consistent with those of Jose ESQUER:





_June 15 seizure of parcel containing Fentanyl_

      39.     On or about June 13, 2020, a Postal Inspector in California was conducting postal database checks and identified a parcel as bearing characteristics common to other drugs parcels previously seized from the San Diego County area, and referred the Subject Parcel to the Miami Division Postal Inspectors.

---

current residence in Palm Beach County.

The parcel was addressed to 1558 NW 102 ST, Miami, FL 33147. A federal search warrant was obtained to open the parcel, which was found to contain approximately one half kilogram of a substance that field-tested positive for a substance that was consistent in appearance as being fentanyl and field-tested positive to be a heroin-fentanyl compound or methamphetamine. Video surveillance footage from a post office in San Diego County, California, shows a person with physical characteristics consistent with those of ESQUER, and wearing a hat that appears to be similar in style to the hat shown in paragraph 30 above:



*June 22, 2020 seizure of parcel containing fentanyl*

40.     On or about June 22, 2020, U.S. Postal Inspection seized a parcel in San Diego County, California that was addressed to "Julie M. 4320 Lilac St. Unit 5c Palm beach Gardens Florida 33410," with the return address of "Brian G. 505 W. 5th Ave, Escondido CA. 92025." It was postmarked on June 22, 2020 from ZIP code 92025. Surveillance video showed a person matching the physical characteristics of ESQUER mailing the parcel:



41.    A federal search warrant was obtained to open the parcel, which was found to contain a substance that was consistent in appearance and texture to be fentanyl.

*Controlled purchase from Alireza Hendijani*

42.    In May 2020, ROMAN was approached by law enforcement and has since cooperated and provided information to agents, including, but not limited to, the following.   ROMAN identified "Ali" as a co-conspirator in this drug trafficking organization, who, as explained below, has been identified as HENDIJANI.   Alireza HENDIJANI has a 2003 federal drug trafficking conviction for conspiracy to possess with intent to distribute heroin, for which he was sentenced to 188 months in the Southern District of Florida, in case number 02-cr-80054.   HENDIJANI is currently on supervised release.   ROMAN described HENDIJANI as the person who directed ROMAN and others, including Joshua GRAUER and Emilio SANTIAGO (known to ROMAN as "Ralphie"),[8] to retrieve mail parcels containing drugs that were addressed to places in South Florida.   According to ROMAN, HENDIJANI met and recruited ROMAN into his drug trafficking efforts while the two were on federal supervised release in the West Palm Beach area.   HENDIJANI was responsible for relaying customer orders obtained by ROMAN, or

21

other co-conspirators, for orders of heroin, fentanyl, or a mix of the two, to HENDIJANI's source of supply. After obtaining customers, ROMAN or others would provide HENDIJANI with mailing addresses to where the drugs could be mailed. These addressed were then relayed to HENDIJANI's source of supply, who ROMAN said included two individuals in California, including one ROMAN called "Diego" (which is NAVARRO's real first name). The drugs would then be mailed, and ROMAN or others would retrieve the packages. After retrieving the packages, ROMAN or others would deliver drugs to customers and used various methods of receiving payment. Proceeds were distributed among HENDIJANI, ROMAN, GRAUER, SANTIAGO, and others. Typically, HENDIJANI would have ROMAN record himself via photograph or video when he would open the packages containing drugs in order to document the occasion and drug amounts. ROMAN described numerous prior mail parcels containing drugs with which ROMAN was involved under the direction of HENDIJANI.

43.     On or about June 19, 2020, ROMAN and HENDIJANI met at a Dunkin' Donuts in West Palm Beach, Florida. This meeting was surveilled by law enforcement and audio and video recorded. After being inside the store, the two sat inside ROMAN's vehicle and had a conversation during which HENDIJANI discussed, among other things, parcels discussed above that were seized by law enforcement (unbeknownst to HENDIJANI). This conversation was recorded and live-monitored by agents on surveillance. HENDIJANI explained to ROMAN that the co-conspirators in California had stopped shipping packages for HENDIJANI to handle because of numerous recent packages that did not successfully make it through the mail system. HENDIJANI explained to ROMAN that HENDIJANI would have to come up with money to make up for the lost packages in order to start working with his sources of supply again.

44.     In and around August and September 2020, ROMAN at the direction of law enforcement officers, engaged in multiple discussions with HENDIJANI regarding the purchase of a kilogram of fentanyl. ROMAN told HENDIJANI that he knew a person who would like to purchase a

---

[8] The name "Ralphie" is listed as an a/k/a in SANTIAGO's criminal records, such as NCIC.

kilogram of fentanyl (in reality the buyer was law enforcement). ROMAN and HENDIJANI agreed that a USPS parcel would be shipped through the mail and their conversations covered multiple other details including mailing, addresses, price, possible delays, and other matters.

45.     On or about September 13, 2020, HENDIJANI contacted ROMAN to confirm a safe mailing address to where the package could be sent. On that date, with the consent and direction of agents, RONAN provided HENDIJANI the address of 1932 SW Delmonico Ave, Port St. Lucie, Florida 34953. On or about September 17, 2020, HENDIJANI confirmed with ROMAN that the deal was in motion. On or about September 21, 2020, HENDIJANI sent a text message to ROMAN that contained the unique tracking number of the drug parcel—EJ292779523US.

46.     On or about September 21, 2020, a Postal Inspector in California, following consultation with Postal Inspectors in West Palm Beach, Florida, conducted postal database checks and identified the parcel. The parcel was forwarded to federal law enforcement in West Palm Beach, Florida and opened pursuant to a federal search warrant on or about September 22, 2020. Inside the parcel, agents found approximately one kilogram of a compressed white substance that field-tested positive for fentanyl. This substance was pressed with a symbol that looks like the one used by the automobile company Audi.

47.     ROMAN made further communications with HENDIJANI regarding the receipt of the package. In the afternoon of September 23, 2020, while being monitored by agents, ROMAN met with HENDIJANI and gave HENDIJANI $42,000.00 as a partial payment for the kilogram of fentanyl. The money was provided by law enforcement. During this meeting, HENDIJANI and ROMAN agreed to have ROMAN deliver the remaining $7,000 owed on September 25, 2020.

48.     On or about September 25, 2020, ROMAN again met HENDIJANI and delivered the remaining $7,000 (also provided by law enforcement). HENDIJANI told ROMAN that he would be keeping $1,000 of it, and giving the remainder to "them," which ROMAN understood to mean co-conspirators in California and Mexico.

49.     On or about September 27, 2020, agents observed via GPS tracking on a mobile phone previously used by Diego NAVARRO to book air travel, that NAVARRO's device traveled from San Diego, CA to Miami, FL in a manner consistent with the use of commercial air travel.  The phone was then observed to travel along the route of I-95 to West Palm Beach, Florida where it then moved throughout the town of West Palm Beach before heading south.  The phone proceeded to Fort Lauderdale airport.  Agents later observed the phone lose GPS signal and reappear in a Houston-area airport and then in San Diego, CA.  Additionally, a flight record from American Airlines showed that Andrew RUELAS departed from Fort Lauderdale Airport in the afternoon of September 27, 2020 on a trip ultimately ending in San Diego by way of Dallas.

*Emilio SANTIAGO arrested in state court for another package containing fentanyl*

50.     On or about September 30, 2020, USPIS Postal Inspectors identified a parcel bearing characteristics common to drug parcels as having passed through the mail stream from San Diego, California to West Palm Beach, Florida.  Federal agents established surveillance of the address at which the parcel was to be delivered.  Agents observed Emilio SANTIAGO drive in his Chevrolet Impala through the neighborhood surrounding this address at approximately 12:05 p.m.    SANTIAGO proceeded to canvass the neighborhood in a manner consistent with counter-surveillance measures for approximately one hour.  At approximately 1:35 p.m., agents observed the suspected drug parcel dropped off at its destination address.  At approximately 1:40 p.m., agents noted that the parcel was marked "delivered" in the USPS online system.

51.     At approximately 2:15 p.m., agents observed a gray Cadillac SUV rental drive up to the package's destination address and honk its horn a number of times.  Shortly thereafter, an unidentified female exited the destination address with a plastic bag through which agents could discern the shape of a box similar to the suspected drug parcel.

52.     Agents at this time relayed their observations to local law enforcement partners who, with the assistance of police aviation units, located the gray Cadillac rental at the intersection of

24

Summit Boulevard and Georgia Avenue in West Palm Beach, Florida. As local law enforcement vehicles approached, but before any emergency lights or sirens were activated, the driver of the Cadillac (later identified as SANTIAGO) ran a solid red light. Police aviation along with patrol units located the vehicle parked in the driveway of a residence, while SANTIAGO exited the car on foot. The aviation unit observed SANTIAGO as he approached the rear of the vehicle, opened the trunk, retrieved a bag, and then discarded the bag as he fled on foot. SANTIAGO was stopped and detained by patrol units approximately 100 yards from the vehicle. The abandoned bag was located and found to contain the suspected drug parcel previously identified by USPIS postal inspectors. A state search warrant was obtained for the parcel and it was found to contain approximately one kilogram of a compressed hard white substance stamped with a symbol that looked like the one used by the company Audi (the same as the symbol pressed into the kilogram of fentanyl obtained for the ROMAN by HENDIJANI as discussed above). SANTIAGO was arrested by state authorities and is still in state custody.

*Joshua GRAUER*

53.     Records show that HENDIJANI, SANTIAGO, and ROMAN were each placed into the same halfway house in West Palm Beach, Florida following their housing in federal prisons. HENDIJANI, SANTIAGO, and ROMAN arrived at the halfway house on the following dates, respectively: January 29, 2019, February 12, 2019, and February 21, 2019. Joshua GRAUER had previously arrived at the same halfway house on or about September 13, 2018, after being sentenced to 144 months on March 14, 2012 on a federal conviction for conspiracy to possess with intent to distribute cocaine. While at the halfway house, residents are allowed to leave the halfway house for several hours per day. HENDIJANI, SANTIAGO, ROMAN, and GRAUER were released from the halfway house on the following dates, respectively: April 26, 2019, May 10, 2019, November 26, 2019, and June 11, 2019.

54.     On or about May 1, 2019 law enforcement arrested a man named Timothy Maloney after executing a search warrant at his residence in Palm Beach County. Inside the home, law

enforcement found, among other things: approximately $38,076 in United States currency, clear vacuum sealed bags; a firearm magazine containing .45 caliber rounds; several containers of pills; plastic bags, and rubber bands; one loaded Springfield Armory .45 caliber handgun; and digital scales. In a Ford Truck parked in the driveway of the house, law enforcement found: cocaine packaged in clear plastic bags; heroin in clear plastic bags hidden in the undercarriage; one loaded RG .22 caliber revolver; and cocaine inside vacuum-sealed bags under the hood.   Deputies also searched the defendant's storage unit located at a nearby Public Storage.   Inside the storage unit, law enforcement found, among other things: approximately $136,729.00 in United States currency; marijuana; ammunition; and drug packaging materials.   Maloney pleaded guilty and was sentenced in Southern District of Florida on January 30, 2020 to 262 months for possession with intent to distribute one kilogram or more of heroin, 280 grams or more of cocaine base, and 500 grams or more of cocaine.

55.     On or about August 7, 2019, agents met with Maloney, who said that a person known to him as Joshua GRAUER was his heroin source of supply during the period of February 2019 until Maloney's arrest in May 2019.   Maloney said he purchased heroin from GRAUER on three separate occasions between February and May 2019.   On the first two occasions, Maloney said he purchased half-kilogram quantities of heroin from GRAUER for $27,500.   On the third occasion, Maloney said he purchased one kilogram of heroin from GRAUER for $52,000.   Maloney recalled that on one occasion when he purchased heroin from GRAUER, GRAUER brought the heroin to Maloney's house and the heroin was inside of a FedEx-type box with an Arizona shipping address.   Maloney said he also noticed that there were several empty "kilo wrappers" inside the box.   Additionally, Maloney said that GRAUER had offered to supply Maloney with cocaine, in addition to heroin, however, Maloney said he already had a source of cocaine supply and that this source offered a better price than GRAUER could offer.   During a subsequent meeting with Maloney on January 30, 2020, agents specifically asked Maloney who was the source of the heroin that was seized from him, and Maloney told agents that he had purchased the heroin from GRAUER.

56.    According to Tyler ROMAN, ROMAN met GRAUER while both he and GRAUER were at the half-way house in West Palm Beach following their release from prison. ROMAN said he was introduced to GRAUER by HENDIJANI, who was another resident at the half-way house.  During this time, ROMAN observed GRAUER wearing a Rolex and other expensive jewelry and recalled that GRAUER appeared to have a lot of wealth despite just being released from prison. ROMAN said that HENDIJANI cautioned ROMAN about GRAUER, expressing his reluctance to work with GRAUER because GRAUER was flashy with his jewelry and money and therefore was attracting too much attention to himself and others.  While at the half way house, ROMAN said he learned about the arrest of one of GRAUER's biggest heroin customers, who HENDIJANI described as the "bread winner." ROMAN said HENDIJANI sent ROMAN a news article related to the man who was arrested.  ROMAN said that upon receiving the article from HENDIJANI, ROMAN watched a news video regarding the arrest and the large amount of drugs that were seized, including heroin and cocaine. ROMAN showed agents the news article and video, which discussed the arrest of Timothy Maloney and the seizure of drugs.  ROMAN said that GRAUER told him that "that was one of my people," referring to Maloney. ROMAN said GRAUER told him that Maloney started buying from GRAUER upon GRAUER's release from prison to help GRAUER get back on his feet.

57.    ROMAN said that following Maloney's arrest, HENDIJANI needed assistance in moving heroin since Maloney was no longer buying large quantities from HENDIJANI and GRAUER. ROMAN became more involved with coordinating the arrival of mail parcels containing heroin. ROMAN said that while working with HENDIJANI, he learned that GRAUER was also receiving parcels of heroin through similar coordination with HENDIJANI.  ROMAN advised that at least one of the parcels intended for GRAUER was confiscated by law enforcement.  ROMAN said that GRAUER did not assist HENDIJANI in covering the cost of the confiscated parcel of heroin, which was owed to HENDIJANI's source of supply.  According to ROMAN, HENDIJANI was not pleased about this. Based on a combination of factors, HENDIJANI stopped doing business directly with GRAUER, but

did use ROMAN as a middle-man between GRAUER and HENDIJANI.  ROMAN said that upon receiving parcels of heroin coordinated by HENDIJANI, ROMAN would deliver some of the heroin to GRAUER.  ROMAN said he would charge GRAUER $1,300 per ounce of heroin, which was the same price that ROMAN paid per ounce.  ROMAN estimated that around the end of May 2019 and the start of June 2019, ROMAN began receiving approximately two parcels of heroin per month.  ROMAN said that each package contained one half kilogram or one kilogram of heroin.  ROMAN said he would usually deliver one quarter of the kilogram (nine ounces) of heroin at a time to GRAUER, but that once in a while, it would be one half of a kilogram.  ROMAN estimated that he delivered nine ounces of heroin from these parcels to GRAUER (at the direction of HENDIJANI) approximately five times. ROMAN said the most heroin that ROMAN ever delivered to GRAUER at one time was one kilogram. ROMAN said he also purchased cocaine and marijuana from GRAUER but that the main purpose of the relationship was so that GRAUER could purchase heroin from HENDIJANI through ROMAN.

## Conclusion

58.    Based on the foregoing, I submit that probable cause exists for the issuance of a criminal complaint against Alireza HENDIJANI, Diego NAVARRO, Jose ESQUER, Tyler ROMAN, Emilio SANTIAGO, Joshua GRAUER, Andrew RUELAS, and Manuel TOPETE, for violation of the laws of the United States, that is, conspiracy to distribute controlled substances, in violation of Title 21, United States Code, Section 846.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

Gregory Hoffman
Special Agent
Federal Bureau of Investigation

Attested to me telephonically by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 on the ___2nd___ day of __February__, 2021, via FaceTime, per Fed.R.Crim.P. 4(d) and 4.1.

WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE

28

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

Defendants: <u>Alireza Hendijani, Diego Navarro, Jose Esquer, Tyler Roman, Emilio Santiago, Joshua Grauer, Andrew Ruelas, and Manuel Topete</u>

Case number: <u>21-8034-WM</u>

**Count 1:**

Conspiracy to distribute controlled substances, in violation of Title 21, United States Code, Sections 846 and 841(a)(1)

**Maximum Penalties:**

Pursuant to Title 21, United States Code, Section 841(b)(1)(A)(vi) and 841(b)(1)(A)(i),[1] namely, a violation involving either 400 grams or more of fentanyl or 1 kilogram or more of heroin, the penalties are:

Minimum of ten years' imprisonment
Maximum of life imprisonment
Fine of up to $10,000
Supervised release of at least five years and up to life

---

1 This penalty sheet is not intended to limit the drug quantities and types attributable to the defendants in any future Indictment, Information, trial, sentencing hearing, or any other phase of the case, but is merely intended to provide the maximum possible penalty relating to the criminal complaint.